William Albert BOOSMAN, a minor by his mother and next friend, Delores Boosman, Plaintiff-Respondent,

v.

Walter F. MOUDY, Defendant-Appellant.

No. 25915.

Missouri Court of Appeals, Kansas City District.

Dec. 18, 1972.

Harold T. Van Dyke, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, for defendant-appellant.

Roy A. Larson, Sprinkle, Carter, Larson & Hanna, Kansas City, for plaintiff-respondent.

Before SHANGLER, C. J., PRITCHARD and WASSERSTROM, JJ., and WILLIAM J. PETERS, Special Judge.

SHANGLER, Chief Judge.

The infant plaintiff was attacked and bitten by Tosca, a large dog of the malemute breed, owned and kept by the defendant. Plaintiff had judgment for $5,000 after the jury verdict of $7,500 was reduced by the trial court order of remittitur. The appellant seeks judgment in accordance with his motion for directed verdict at the close of all the evidence on the ground that plaintiff did not prove a prima facie case or, alternatively, seeks reversal because of instruction error.

We have reviewed the evidence in the light most favorable to the verdict and conclude that, under governing principles of law, the plaintiff proved a submissible case. The evidence was received under a petition which alleged that the defendant, Walter F. Moudy, was the owner of a dog, Tosca, which made a vicious and unprovoked attack upon the plaintiff, Billy Boosman, then five years of age, while he was a guest in the residence of the defendant. The Boosman family and the Moudy family were neighbors, separated by one house. The Boosmans had three children, the plaintiff Billy and his twin Mitchell and a daughter, Dana, then nine years of age. The Moudys had three children, two boys and a girl, Jennifer, who was close in age to Dana. Jennifer and Dana, as could be expected, were frequent playmates.

Tosca was only several weeks old when acquired by the Moudys. At first, Tosca was such a playful whelp, furry, friendly and lovable, that Mrs. Boosman would often ask Jennifer to bring him[1] over. The children of both families played with the

---

1. There is no hint as to how this male scion of a virile canine breed comes to bear the name of a tragic diva-heroine of the Bonaparte era.

dog without fear or incident. Some months later, the Moudy family went on vacation for a couple of weeks and left the dog with Mrs. Moudy's mother for keeping. One day after the Moudys had returned from vacation, Jennifer and Dana ran into the Boosman family room in a state of agitation and excitement. Jennifer's skirt had been torn and ripped away from the bodice, and Mrs. Boosman was made to understand that Tosca had done it. Dana testified that she and Jennifer had entered the Moudy back yard through the fence and that Tosca, without provocation, growling and snapping, jumped upon Jennifer and tore her clothes. (Jennifer Moudy, on the other hand, testified that it was a playful event, and that she and the dog frequently enjoyed a "tug of war" frolic whereby Tosca gripped her garment and tore it away.) Mrs. Boosman's children had complained to her that since the Moudys had returned from vacation, Tosca had menaced them by growling and bristling so that they had become frightened of him. For this reason, Dana rarely visited Jennifer at the Moudy home any more, and then only after she was assured that Tosca was in the fenced back yard. Some time later, Mr. and Mrs. Boosman had occasion to be outside the Moudy back yard fence and Mrs. Boosman called to Tosca. Tosca came within a few feet of the fence, stopped, growled, bristled and bared his teeth at her. Mrs. Boosman could not believe it was the same dog she had known.

These incidents prompted Mrs. Boosman to telephone Mrs. Moudy to learn if she had noticed the marked change in the dog's behavior. Mrs. Moudy explained that Tosca had not gotten along well with her mother's dog, had been placed in a kennel and had been sulking since they returned from vacation.

A few weeks before the injury to Billy, Mrs. Boosman visited Mrs. Moudy. The children had continued to complain and there appeared to be no improvement in the dog's behavior, so Mrs. Boosman, personally, undertook to speak to Mrs. Moudy about the children's fears. She told Mrs. Moudy that the children had complained that the dog snapped and growled when they tried to feed it. Mrs. Moudy was aware that the dog was behaving that way. Tosca had growled at her, as well, when she fed him, but she had "let him know who was boss". Mrs. Boosman expressed her astonishment that a dog once so happy had become so vicious.

Another tendency of the dog Tosca was established by Jennifer Moudy. Dana Boosman had testified to a hazy recollection of an incident described to her by Jennifer, when Tosca jumped on a boy, Brian, bit and scratched him and ripped his shirt. On examination, Jennifer denied that Tosca had attacked Brian: "Tosca, you know, he was a dog who loved everything. You know, he jumps up on people and kisses them and everything. If that is what you call 'attack', he did that."

One Sunday morning, Jennifer invited Dana to her home. Billy asked to go along because he was anxious to show Jennifer's brother, Chris, a Batman stamp set he had just acquired. Mrs. Boosman permitted the visit only after she had determined that Mr. and Mrs. Moudy were up and around and, also, that Tosca was in the fenced back yard. (Mrs. Boosman had established the rule that her children could visit the Moudy home only if Jennifer's parents were there and the dog was out of the house.) Dana gave this account of the events thereafter: Billy was kneeling by a table displaying his Batman stamps to Chris when suddenly and without provocation, Tosca ran into the room growling and bristling. Jennifer shouted to the others to jump upon the piano, a refuge which only she and Dana reached. Chris made for the stairs and Billy remained behind. Tosca set upon Billy, bit his shoulder and opened gashes on Billy's scalp from which there was a profusion of blood. Chris called his father who pulled Tosca off Billy and then tended the boy's wounds. At the time of the attack, Tosca was one year old, stood about two and one-half feet

tall, was three and one-half feet long and weighed from 100 to 200 pounds.

■ One who keeps a domestic animal—that is, an animal of a species that is ordinarily harmless—which to his knowledge is vicious or dangerous or of such a propensity, is liable for an injury done to a person by that animal. 4 Am.Jur.2d, Animals, Section 86; Lyman v. Dale, 262 Mo. 353, 171 S.W. 352, 355 (concurring opinion by Lamm, J.). Liability for injury to persons by dogs falls within this general rule of the common law.[2] Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667, 668 [2]. The gist of the action, in either case, is the keeping of the animal with knowledge of its vicious propensities. Maxwell v. Fraze, Mo.App., 344 S.W.2d 262, 264 [4]. Scienter is sufficiently shown if the keeper knows of the dog's vice or has seen or heard enough to warn a man of ordinary prudence that the animal is ferocious or vicious in disposition. Humes v. Salerno, Mo., 351 S.W.2d 749, 752 [2].

■ The defendant contends, however, that the evidence does not show Tosca had dangerous propensities, or, if he did, that defendant had reason to know of them. The absence of any evidence that Tosca had ever before attacked or bitten anyone, defendant argues, is conclusive proof that the dog was not vicious. A dog is not entitled to a first bite, of course, before the keeper must take notice of its behavior nor is the habit of biting persons the only evidence of a vicious nature. O'Neill v. Blase, 94 Mo.App. 648, 68 S.W. 764, 770; Merritt v. Matchett, 135 Mo.App. 176, 115 S.W. 1066, 1068; 3 C.J.S. Animals § 148(c). Any tendency of a dog to injure persons, whether the dog acts from a purpose to do bodily harm, from ill-temper, or only playfulness, is a dangerous propensity for which a keeper who has reason to know of such habit will be liable. Dansker v. Gelb, Mo., 352 S.W.2d 12, 16 [5]; 3 C.J.S. Animals § 148(c); 4 Am.Jur.2d, Animals, p. 342.

■ The plaintiff's evidence tended to show that Tosca had become ill-natured and acquired the menacing habit of growling, bristling and snapping at people. This appearance of viciousness subjected the Boosman children to fear of bodily harm and kept them from the Moudy home when Tosca was within. It was a propensity displayed not only occasionally, but persistently since Tosca's return from the kennel (and which had been brought repeatedly to the attention of Mrs. Moudy) until the event of the injury to Billy. It was a propensity, the jury could have found, of which Mrs. Moudy herself was aware and which prompted her to show Tosca "who was boss", and a propensity which prompted an unprovoked attack upon Jennifer and upon the boy Brian.

Even the defendant's own evidence of these events tends to prove the submissibility of the plaintiff's case. Jennifer had encouraged Tosca, albeit playfully, to pursue her, gnash and grip her clothing with his teeth and rip them from her. Jennifer's parents were aware that she frequently played this game with Tosca in which Jennifer, in teasing the dog, used her garment as a "tug of war toy", as Mrs. Moudy described it. As to the incident involving Brian, Jennifer testified that it was not an attack, rather Tosca was only demonstrating his affection by jumping on him, as he frequently did with people. Jennifer's brother, Chris, gave the explanation that Tosca "greets people with his front paws on your shoulders. You are not quite ready for it if you don't know when it's going to come. Sometimes he can knock you down". According to Jennifer and Chris, the injury to plaintiff resulted from a game, not fully described, which ended when Billy saw Tosca, ran from him and was chased, knocked down and bitten by

2. The common law requirement of scienter, however, has been changed by Section 273.020, V.A.M.S. which imposes absolute liability upon the owner of a dog which injures or kills a domestic animal. Miller v. Prough, 203 Mo.App. 413, 221 S.W. 159.

the dog. On the evidence and under the instructions of the court, the jury was justified in returning a verdict on the basis that the injury to Billy resulted from a propensity of the dog to do bodily harm in anger—as the plaintiff's proof suggested—or from the playfulness and fawning nature of this large dog—inferable from defendant's evidence.

■ The defendant may not tenably argue that there was no evidence that he had not been told of the dog's dangerous propensities and therefore he cannot be held to that knowledge. The defendant, himself, had reproved Jennifer for playing tug of war with Tosca. The jury could have found that the defendant had reason to know of the other fixed and dangerous habits of this family pet known by or disclosed to other members of the household. Nor is it essential to the keeper's liability that he should have notice of the particular sort of act which produced the injury; knowledge that Tosca's disposition was such that he would be likely to commit an injury similar to the one complained of is sufficient. O'Neill v. Blase, 94 Mo.App. 648, 68 S.W. 764, 770; 4 Am.Jur.2d, Animals, p. 343. The authorities defendant has cited in support of his position on this point deal with dissimilar circumstances and are not persuasive. Some of them deny recovery because the tendency of the animal to do injury was only occasionally manifested, and others, because the injured persons provoked the injuries complained of. In this case, however, there was no evidence of provocation and substantial evidence of a tendency to do personal injury and that the defendant had reason to know of it.

MAI does not contain an approved instruction on the liability of a possessor or keeper of a domestic animal which he has reason to know has dangerous propensities. Plaintiff devised his Instruction No. 2 for that submission:

"Your verdict must be for the plaintiff, Billy Boosman, if you believe:

"FIRST: The defendant knew or should have known that the dog, Tosca, was possessed of dangerous propensities, and

"SECOND: The defendant failed to restrain the dog, and

"THIRD: The defendant was thereby negligent, and

"FOURTH: As a direct result of such negligence the plaintiff sustained damage."

Two other instructions were submitted by plaintiff, one defining "Negligence" in terms of the failure to exercise ordinary care, and the other, defining "dangerous propensities" as meaning the tendency of the dog to injure, whether in play or in anger. Defendant complains only of Instruction No. 2 and asserts three distinct grounds. First, that the instruction allows recovery without a finding that the dog Tosca was possessed of dangerous propensities, and therefore assumes that disputed fact; Second, that the instruction does not limit the defendant's knowledge of the dog's dangerous propensities to the time prior to the injury in question; and, Third, that the failure to restrain the dog was not submissible because the uncontroverted evidence shows that Tosca was in the defendant's living room.

■ The first ground of complaint is foreclosed to defendant because not preserved in his motion for new trial. Supreme Court Rules 70.02 and 79.03, V.A.M.R. The second ground is untenable because recovery is allowed under Instruction No. 2 only if plaintiff's damage *resulted* from defendant's failure to restrain the dog whose dangerous propensities the defendant had reason to know, thus clearly and logically limiting the defendant's liability to knowledge of the dog's tendencies prior to the injury. The last ground, that sufficient restraint of the dog was shown, as a matter of law, by the uncontroverted showing that Tosca was confined to the defendant's home is equally untenable. Defendant does not seriously argue this point,

and, indeed, the law is against him. As we have noted, the gist of the action is the *keeping* of a vicious dog after knowledge of his vicious propensities. Bush v. Anderson, Mo.App., 360 S.W.2d 251, 256 [10, 12]. State ex rel. Kroger Co. v. Craig, Mo.App., 329 S.W.2d 804, 808 [10–11]. Although the plaintiff submitted his cause of action on a negligence theory, it was a burden he need not have assumed. The owner or keeper of a dog he has reason to know had dangerous tendencies is not relieved of the duty to restrain the animal, although he has exercised the utmost care to prevent the animal from doing the harm. Liability for injury arises from the keeping of the animal at all after such knowledge. Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667, 669; 3 C.J.S. Animals § 151, p. 1257. Nor are the premises of one who keeps a vicious dog with knowledge of his propensities a sanctuary from liability for the keeper's failure to restrain the animal from doing injury to a person lawfully upon such premises. Carrow v. Haney, 203 Mo. App. 485, 219 S.W. 710, 712 [5].

The judgment is affirmed.

All concur.